**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

---

| | |
|---|---|
| BRANDI CAMPBELL, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | CASE NO. 20-CV-05321 |
| v. | |
| MARSHALL INTERNATIONAL, LLC D/B/A GOLD CLUB CHICAGO A/K/A THE GOLD ROOM AND PERA M. ODISHOO, | Magistrate Judge Jeffrey T. Gilbert |
| Defendants. | |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF THE COLLECTIVE ACTION SETTLEMENT AGREEMENT**

## I.    INTRODUCTION

Plaintiffs respectfully request that the Court grant final approval of this collective action settlement. This Settlement provides for a non-reversionary total payment of $500,000.00  See Settlement Agreement (attached as Exhibit 1) at ¶ 2(Q). As set out below, this amount provides significant compensation to the Settlement Collective members, with the highest settlement award in excess of $15,000.00, and the average award at approximately $3,130.00. Manewith Decl. (attached as Exhibit 2) at ¶ 10.

On March 21, 2025, this Court granted preliminary approval of the settlement. Dkt. 208. On April 10, 2025, the Court approved Plaintiffs' proposed Notice of Collective Action Settlement Agreement and authorized Plaintiffs to send the notice to Settlement Collective Members. Dkt. 211. On April 23, 2025, the Settlement Administrator sent out notice to Settlement Collective Members by First Class Mail. Yim Decl. (attached as Exhibit 3) at ¶ 2. Throughout May and June, the Settlement Administrator sent reminders by mail, email, phone, and text to Settlement Collective Members who had not yet responded. Ultimately, of the 94

1

members of the Settlement Collective, the Settlement Administrator connected with 91 of them, all but one of whom have submitted claims. Id. at ¶ 4. With respect to the remaining 3 Settlement Collective Members, the Settlement Administrator sent each at least one text reminder, two reminders by mail, and two email reminders, and the Settlement Administrator also attempted to call each of those members at least three times, leaving voicemails when possible. Id. There have been no objections to the proposed Settlement and no requests for exclusion. Id. at ¶ 5. The fact that the Settlement Collective overwhelmingly supports the Settlement strongly favors final approval.[1]

The settlement is entitled to a presumption of fairness because it is the result of arm's length negotiations between experienced counsel, assisted by an experienced and independent Magistrate Judge who oversaw the Parties' settlement conferences. In addition, the Parties have been litigating this case for over four years, during which time they conducted extensive discovery. See Manewith Decl. at ¶ 4. Based on the information obtained through discovery, including detailed time and pay records for each Settlement Collective Member, Plaintiffs' Counsel have prepared detailed damages analyses. Id.

Finally, the Settlement merits final approval because it offers the Settlement Collective substantial advantages over continued litigation of this case. Specifically, Settlement Collective Members will receive significant financial compensation and they will avoid the risks inherent in the continued prosecution of this case, in which Defendants have asserted various defenses to

---

[1]     See Sanchez v. Roka Akor Chicago LLC, 2017 WL 1425837, at *2 (N.D. Ill. Apr. 20, 2017) ("The absence of any objections to the Settlement by Class Members . . . supports approval of the Settlement."); In re Mexico Money Transfer Litig., 164 F.Supp.2d 1002, 1021 (N.D.Ill.2000) aff'd, 267 F.3d 743 (7th Cir.2001) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement").

liability.[2] The average settlement award in this case is approximately $3,130.00, and the highest payout is estimated to be in excess of $15,000.00. Manewith Decl. at ¶ 10. For these reasons, detailed further below, the Court should enter an order granting final certification of the Settlement Collective and collective action pursuant to 29 U.S.C. § 216(b) and grant final approval of the Settlement.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Defendant Marshall International, LLC d/b/a Gold Club Chicago a/k/a The Gold Room (the "Gold Room") is an adult entertainment strip club. Complaint at ¶ 1. Plaintiff Brandi Campbell is a former exotic dancer at the Gold Room. Id. at ¶ 1, 4.

On September 9, 2020, Plaintiff filed a complaint on behalf of herself and similarly situated exotic dancers at the Gold Room against Defendants, alleging federal and state law violations by Defendant. Id. Plaintiffs assert FLSA violations for Defendants' classification of Plaintiff and other dancers as "independent contractors" rather than "employees," Defendants' failure to pay Plaintiffs minimum wage required by that statute, and Defendants' requirement that Plaintiffs share their tips with managers and other non-eligible Gold Room employees or agents. Id. at ¶¶ 2, 3, 20, 21. Plaintiffs also allege (1) violations of the IMWL, 820 § 105/1, *et seq.* for the aforementioned misclassification and failure to pay minimum wage and (2) violations of the IWPCA, 820 ILCS §115, *et seq.* for the aforementioned mishandling of tips. Id. at ¶¶ 32-36.

On August 1, 2022, the Court conditionally certified a collective of individuals who worked as exotic dancers for the Gold Room from August 12, 2018 (three years before Plaintiffs

---

[2]     Defendants have denied that Plaintiffs and Defendants had an employee-employer relationship, that Plaintiffs were paid below minimum wage, and that Plaintiffs were required to share their tips. Defendants also maintain that Plaintiffs voluntarily agreed to be classified as independent contractors, among other defenses.

3

moved for preliminary certification of a collective action), through the present, and notice was sent to Defendants' current and former dancers. Settlement Agreement at ¶ 4. As a result, ninety-seven (97) opt-in plaintiffs joined the case. Id. Four (4) opt-in plaintiffs subsequently sought to withdraw from the Litigation; accordingly, there are currently ninety-four (94) Plaintiffs in the case including Ms. Campbell. Id.

Over a period of approximately eight months, the Parties negotiated at arms' length to reach the Settlement Agreement, accounting for facts and materials developed during discovery. Settlement Agreement at ¶ 5. Defendants provided Plaintiffs with records of days worked and amounts earned for Putative Settlement Collective Members. Id. The Parties' negotiations included two settlement conferences with Magistrate Judge Jeffrey Gilbert, the second of which immediately preceded the Settlement Agreement. Id. The Parties agreed to settle the action in accord with the terms of the Settlement Agreement.

As Plaintiffs explained in their Motion for Preliminary Approval, the Settlement includes a gross cash payment of Five Hundred Thousand Dollars and Zero Cents ($500,000.00) (the "Gross Settlement Amount"). See Settlement Agreement at ¶ 2(Q). Each Settlement Collective Member will first receive $200.00. Id. at ¶ 34. Then, the remaining Settlement Amount (after deductions for fees, expenses, service awards, and a reserve fund[3]) will be divided among Settlement Collective Members in proportion to how many days each member worked for Defendants between August 12, 2018 (three years prior to Plaintiffs' motion to preliminary certify the collective action), and December 17, 2024 (the date of the settlement conference when the Parties agreed to the key terms of the settlement). Id. In exchange, the Settlement Agreement

---

[3]      The Reserve Fund will be reallocated to the Settlement Collective Members as a second distribution after any disputes are resolved.  Settlement Agreement at ¶ 33. Any remaining funds leftover after the second distribution will be distributed to Legal Aid Chicago, a *cy pres* recipient.  Id.

contains a release of any and all individual or class action wage and hour claims, obligations, demands, actions, rights, causes of action and liabilities against Releasees that were or could have been asserted in the Litigation based on the facts alleged that accrued or accrue through December 17, 2024, whether based on the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201 *et seq.*, Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*, the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*, the Chicago Minimum Wage Ordinance, Chapter 1-24, Section 1-24-020, *et seq.*, any other source of federal law or law in Illinois, including state common laws, local laws, other penalties, related tort, contract, liquidated, punitive damages claims, claims for interest, attorneys' fees, litigation and other costs, expenses, restitution, and equitable and declaratory relief. Id. at ¶¶ 17, 18. There will be no reversion of funds to Respondents.

On March 11, 2025, Plaintiffs moved for preliminary approval of the settlement. Dkt. 207. The Court granted Plaintiffs' Motion for Preliminary Approval on March 31, 2025. Dkt. 208. On April 10, 2025, the Court approved Plaintiffs' Notice of Collective Action Settlement Agreement and authorized Plaintiffs to send the notice to Settlement Collective Members in a manner consistent with the procedures set forth in the Settlement Agreement. Dkt. 211. On April 23, 2025, the Settlement Administrator mailed notice of the settlement to the 94 Settlement Collective Members by USPS First Class Regular Mail. Yim Decl. at ¶ 2. Throughout May and June, the Settlement Administrator followed up with phone calls, voicemails, text messages, emails, and physical mail reminders to Settlement Collective Members who had not yet responded. Id. at ¶ 3. Ultimately, the Settlement Administrator connected with all but 3 Settlement Collective Members. Id. at ¶ 4. The Settlement Administrator made multiple phone calls to each of those 3 Settlement Collective Members, leaving voicemails when possible, and

sent them each reminders by text message, email, and mail. Id. Of the 91 Settlement Collective Members that the Settlement Administrator successfully connected with, all but one of them submitted a claim form. Id. Moreover, there have been no objections to the settlement, and no requests for exclusion. Id. at ¶ 5.

III.    **ARGUMENT**

Plaintiffs respectfully request that the Court grant final approval of the Settlement Agreement.

    A.    **Final Certification of the Settlement Collective Pursuant to 29 U.S.C. § 216(b) Is Appropriate**

As an initial matter, Named Plaintiff Campbell has brought her FLSA claim as a collective action, and final collective action certification of the Settlement Collective pursuant to 29 U.S.C. § 216(b) is appropriate. Defendants agree that certification for settlement purposes is appropriate. Settlement Agreement at ¶ 21. The Parties respectfully request final certification of a class consisting of the 94 individuals who opted into this litigation.

District courts in the Seventh Circuit generally use a two-step process for conditional certification. See Russell v. Illinois Bell Tel. Co., 575 F. Supp. 2d 930, 933 (N.D. Ill. 2008). At the first step, Plaintiff "must make a modest factual showing sufficient to demonstrate that there are similarly situated employees who are potential claimants." Id. If so, the court may conditionally certify the collective action and authorize notice of the action be sent to potential class members. Id. On August 1, 2022, the Court conditionally certified a collective action consisting of "[a]ll individuals who have worked as exotic dancers for the Gold room in Stone Park, Illinois, between three years prior to the filing of the motion for conditional certification and the entry of judgment in this case." Dkt. 46 at 15. After preliminary certification was

granted and notice issued, 94 individuals (including Campbell) ultimately opted into and pursued this litigation. Settlement Agreement at ¶ 4.

At the second stage, "[o]nce it is known which employees will be part of the class, the Court must reevaluate the conditional certification 'to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis.'" Jirak v. Abbott Laboratories, Inc., 566 F. Supp. 2d 845, 848 (N.D. Ill. 2008) (quoting Heckler v. DK Funding, LLC, 502 F. Supp. 2d 777, 779 (N.D. Ill. 2007)). "At step two, the Court must consider: (1) whether the plaintiffs share similar or disparate employment settings; (2) whether affirmative defenses raised by the defendant would have to be individually applied to each plaintiff; and (3) any fairness and procedural concerns." Jirak, 566 F. Supp. 2d at 848 (citing Mielke v. Laidlaw Transit, Inc., 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004)).

An analysis of these factors reveals that final collective action certification is warranted in this case. Campbell and the Settlement Collective Members all shared the same job duties as exotic dancers at the Gold Room. Defendants uniformly classified these individuals as independent contractors, and they were compensated in the same manner (and were not paid an hourly wage by Defendants). See Dkt. 1 (Compl.). Likewise, the Settlement Collective was subject to the same uniform policies of paying house fees and a portion of tips to the Defendants. Id. Campbell and Settlement Collective Members have identical claims arising out of their misclassification as independent contractors and Defendants' failure to pay them minimum wage under the FLSA. Id. Any analysis of potential FLSA exemptions applicable to the Settlement Collective Members would be uniform across the collective because of their common job duties. Further, Defendants have asserted the same defenses, such as lack of willful or reckless disregard under the FLSA, for all Settlement Collective Members. See Dkt. 44 (Defs.' Answer) at 14.

7

In sum, collective action certification pursuant to 29 U.S.C. § 216(b) for purposes of settlement is appropriate in this case.

### B.      The Settlement Is Fair And Reasonable Resolution of a Bona Fide Dispute Under the FLSA

In evaluating an FLSA settlement, "the court must consider whether the agreement reflects a reasonable compromise of disputed issues . . .." Burkholder v. City of Ft. Wayne, 750 F. Supp. 2d 990, 994–95 (N.D. Ind. 2010) (quoting Misiewicz v. D'Onofrio Gen. Contractors, No. 08 CV 4377(KAM)(CLP), 2010 WL 2545439, at *3 (E.D.N.Y. May 17, 2010)) (internal quotation marks omitted).  See also Kujat v. Roundy's Supermarkets Inc., 2021 WL 4551198, at *1 (N.D. Ill. Aug. 11, 2021). In other words, an FLSA settlement should be approved by the Court if it is "a fair and reasonable resolution of a bona fide dispute over FLSA provisions." Woods v. Club Cabaret, Inc., 2017 WL 4054523, at *6 (C.D. Ill. May 17, 2017) (quoting Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1353, 1355 (11th Cir. 1982)) (internal quotation marks omitted).

Here, as explained in Plaintiffs' Unopposed Motion for Preliminary Approval of the Collective Action Settlement Agreement, a bona fide dispute exists regarding Plaintiffs' FLSA claims. In particular, the Parties disagree on various legal and factual issues including:

1)      Whether Plaintiffs and Defendants had an employee-employer relationship, see Dkt. 44 (Defs.' Answer) at ¶ 10, 26, 28;

2)      Whether Defendants paid the exotic dancers who worked at the Gold Room minimum wage, Dkt. 44 (Defs.' Answer) at ¶ 18;

3)      Whether Defendants required exotic dancers to share tips with managers and/or non-service employees or agents of the Gold Room, Dkt. 44 (Defs.' Answer) at ¶ 21;

4)      Whether Defendant Odishoo "directed and controlled the payment policies of the club and the rules with respect to the dancers," Dkt. 44 (Defs.' Answer) at ¶ 6;

8

5)    The extent to which Defendant Gold Room exercised control over how its exotic dancers performed their jobs, <u>see</u> Dkt. 44 (Defs.' Answer) at ¶¶ 11-14;

6)    Whether Plaintiffs constitute a valid FLSA collective outside of the settlement context, <u>see</u> Dkt. 26 (Def. Marshall's Resp. to Pl.'s Mot. for Conditional Certification) at 1-2, 4-5, 24-25;

Thus, a bona fide dispute undisputedly exists.

Further, the settlement constitutes a fair and reasonable resolution of that dispute. "Normally, a settlement is approved where it is the result of contentious arm's-length negotiations, which were undertaken in good faith by counsel and serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation." <u>Woods</u>, 2017 WL 4054523, at *6. The Settlement Agreement satisfies this standard; <u>see also</u> <u>Briggs v. PNC Fin. Services Group, Inc.</u>, 1:15-CV-10447, 2016 WL 7018566, at *1 (N.D. Ill. Nov. 29, 2016) (settlement approval granted where "[t]he settlement was the result of vigorously contested litigation with extensive formal and informal discovery, a motion for collective conditional certification, and arm's-length negotiations."). Here, each of these requirements is met.

First, the settlement was negotiated in good faith at arm's-length under the guidance of an impartial, experienced Magistrate Judge. These negotiations were carefully carried out over eight months, after the parties exchanged and analyzed substantial information. Thus, this factor weighs in favor of approving the agreement.

Second, as stated above, there were serious legal and factual disputes that placed the ultimate outcome in doubt. Again, Plaintiffs contended that they were misclassified as independent contractors and that they were actually employees, but Defendant believed that it had appropriately classified all collective members as exempt non-employees under the FLSA.

If Plaintiffs were unsuccessful on this central liability question, then they would not have recovered any damages. The Parties also disputed whether the amounts paid directly by customers to Plaintiffs could be used as an offset to any potential award of damages.

Third, the value of immediate settlement is substantial due to concerns regarding Defendants' financial ability to sustain a larger settlement or judgment. See Lucas v. Vee Pak, Inc., 2017 WL 6733688, at *11 (N.D. Ill. Dec. 20, 2017) (defendant's inability to withstand a large judgment supports the reasonableness of class settlement).

Fourth, Plaintiffs believe that the settlement is fair and reasonable. The average settlement payment to collective members after the subtraction of attorney's fees, costs, and service payments is approximately $3,130.00. Manewith Decl. at ¶ 10. Prior to mediation, Plaintiffs' counsel calculated that the potential damages of the collective for unpaid minimum wages (using the higher applicable State of Illinois minimum wage) were approximately $462,000, and an additional approximately $419,000 may be recovered for unlawful deductions. Id. at ¶ 4. The settlement of $500,000 is thus greater than the potential minimum wage damages the collective could recover through trial, and approximately 57% of the total amount of potential damages for unpaid minimum wages and unlawful deductions. Consequently, the settlement is well within the range of settlements that are often approved under the FLSA. See Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust, 834 F.2d 677, 682 (7th Cir. 1987) (finding adequate a settlement of 10% of the total sought due to risks and costs of trial). The reasonableness of the settlement is further supported by the fact that no Settlement Collective Members have objected, and 90 out of 94 Collective Members—that is, 96% of the collective—have signed submitted claims forms. Manewith Decl. at ¶ 9. Consequently, because

the Settlement furthers the purposes of the FLSA and resolves a bona fide dispute, it is

reasonable and should be approved.

### C.    The Requested Attorneys' Fees and Costs Are Fair and Reasonable

The Settlement Agreement provides that Class Counsel may apply for attorneys' fees in

the amount of thirty percent of the Gross Settlement Amount, which would amount to $150,000.

Settlement Agreement at ¶ 30(b). As set forth further below, that share is fair and reasonable and

comports with the fee awards commonly approved in class actions in the Seventh Circuit. [4]

Courts favor awarding fees from a common fund based upon the percentage of the fund

method.  As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a
> common fund for the benefit of persons other than himself or his client is entitled
> to a reasonable attorneys' fee from the fund as a whole. . . . Jurisdiction over the
> fund involved in the litigation allows a Court to prevent . . . inequity by assessing
> attorney's fees against the entire fund, thus spreading fees proportionately among
> those benefited by the suit.

Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (citations omitted); see also Blum v.

Stenson, 465 U.S 886, 900 n.16 (1984); In re Thirteen Appeals Arising Out of the San Juan

Dupont Plaza Hotel Fire Litig., 56 F.3d 295 (1st Cir. 1995) (awarding attorneys' fees of $68

million out of a $220 million settlement fund).  Among the advantages of the percentage

---

[4]     Indeed, "[t]he Seventh Circuit has held that district courts 'must set a fee by approximating the
terms that would have been agreed to *ex ante,* had negotiations occurred.'" Gehrich v. Chase Bank USA,
N.A., 316 F.R.D. 215, 235 (N.D. Ill. 2016); see also Schulte v. Fifth Third Bank, 805 F. Supp. 2d 560, 598
(N.D. Ill. 2011) (approving attorneys' fees in the amount of 1/3 of the settlement and noting that plaintiff
authorized her attorney to seek a fee of up to 33.3% of her potential recovery); Pavlik v. FDIC, No. 10 C
816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) ("Based on the actual contingency fee
agreements Plaintiffs' counsel signed with the two named plaintiffs, as well as the market data for fees in
cases of this size, the Court finds that Plaintiffs' counsel are entitled to attorneys fees in the amount of 33
1/3% of the common fund."); Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc., No. 02-cv-1109,
2004 WL 768658, at *2 (S.D. Ill. Mar. 19, 2004) (explaining that the "first" benchmark "is the actual
agreements negotiated by the named Plaintiffs and the Class Counsel prior to commencement of the
litigation" and awarding 33 1/3% of the common fund).  Here, Named Complainant Campbell agreed to a
one-third contingency arrangement at the outset of the case.

approach is the fact that it is less burdensome to administer than the lodestar method. <u>See</u> <u>Thirteen Appeals</u>, 56 F.3d at 307. Moreover, the percentage of recovery approach is preferred because it is result-oriented, thereby promoting the more efficient use of attorney time and resources, rather than encouraging attorneys to prolong litigation in order to inflate their recoverable hours. <u>See id.</u> ("[U]sing the [percentage of fund] method . . . enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency. Under the latter approach, attorneys not only have a monetary incentive to spend as many hours as possible (and bill for them) but also face a strong disincentive to early settlement"); <u>see also</u> <u>In re</u> <u>Synthroid Mktg. Litig.</u>, 325 F.3d 974, 979-80 (7th Cir. 2003).

In addition, awarding a percentage of the common fund, such as the thirty percent fee sought in this case, recognizes and encourages the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees.[5] Contingency arrangements provide critical access to the courts for people who otherwise would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case. It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." <u>Reiter v. Sonotone Corp.</u>, 442 U.S. 330, 344 (1979) (addressing antitrust laws).

---

[5]     In approving one-third contingency fees for such cases, courts have recognized that plaintiffs' counsel who take cases on contingency, including the undersigned, often spend years litigating cases vigorously without receiving any payment at all for their work. The system of permitting attorneys to accept work on a contingency basis recognizes that in many cases, attorneys will not receive any payment for years (if at all), and in some cases they will receive earlier larger payments. <u>See, e.g.</u>, <u>Hensley</u> <u>v. Eckerhart</u>, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"). Such a system allows parties access to the courts who would not otherwise be able to find competent, and successful, counsel to represent them.

12

Moreover, fee requests similar to the one made by Class Counsel here have routinely been approved by courts in the Seventh Circuit, particularly in employment cases. See, e.g., Castillo v. Noodles & Co., 2016 WL 7451626, at *4 (N.D. Ill. Dec. 23, 2016) (awarding attorneys' fees of one-third of the settlement fund in a FLSA collective class action); Brandon v. 3PD, Inc., No. 13-CV-03745, slip op. at 1 (N.D. Ill. Jan. 26, 2016) (awarding one-third of the common fund as attorneys' fees); McCue v. MB Fin., Inc., 2015 WL 4522564, at *3-*4 (N.D. Ill. July 23, 2015) (awarding attorneys' fees of one-third in wage and hour settlement); Campbell v. Advantage Sales & Mktg. LLC, No. 1:09-CV-01430-LJM, 2012 WL 1424417, at *2 (S.D. Ind. Apr. 24, 2012) (awarding of one-third of settlement plus costs in FLSA collective action); Leung v. XPO Logistics, Inc., 326 F.R.D. 185, 201–02 (N.D. Ill. 2018) (awarding fee of one-third of the settlement fund and noting that such fees are standard); Retsky Family Ltd. P'ship v. Price Waterhouse LLP, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33 1/3% to 40% of the amount recovered."). As in these cases and for the reasons set forth above, the Court should approve the requested fee award.[6]

Additionally, the Settlement Agreement provides that Class Counsel may separately recover the costs they incurred in litigating the case and administering the settlement. Settlement Agreement at ¶ 30(b). Class Counsel's costs equal $16,460.00. Manewith Decl. at ¶ 11. These costs are reasonable and therefore should also be approved.

---

[6]      Class Counsel believes that a lodestar cross-check is unnecessary. See Cook v. Niedert, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach"); Schulte, 805 F. Supp. 2d at 598, n. 27 (recognizing irrelevance of lodestar crosscheck); Will v. Gen. Dynamics Corp., No. CIV. 06-698-GPM, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."). In any case, here, Class Counsel spent hundreds of hours litigating this case and incurred thousands of dollars in costs, such that any lodestar cross-check would also support the requested fees.

### D. The Proposed Service Awards Are Fair and Reasonable

Finally, the proposed settlement also provides that Defendants will not oppose service awards to Ms. Campbell and to the other Plaintiff Representatives in the amounts of $10,000.00 and $5,000.00, respectively. Settlement Agreement at ¶ 30(a). Ms. Campbell worked with Class Counsel on this case for over four years, responding to discovery requests, sitting for a deposition, and attending both settlement conferences on behalf of the collective. The other Representative Plaintiffs similarly assisted Class Counsel and attended the settlement conferences. The requested incentive payments are fair and reasonable and should be approved, given that it was through the efforts and risks taken by Ms. Campbell and the other Plaintiff Representatives that this recovery was obtained.

Courts routinely approve incentive payments as a way of compensating class representatives for lending their names, reputations, and efforts to the prosecution of litigation on behalf of others, and to promote class settlements while encouraging plaintiffs to act as "private attorneys general" in the enforcement of state and federal law. See In re Relafen Antitrust Litig., 231 F.R.D. 52, 82 (D. Mass. 2005) ("Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where, as here, the named Plaintiff participated actively in the litigation"); see also Sheppard v. Consol. Edison Co. of New York, Inc., 2002 WL 2003206, *5-6 (E.D.N.Y. 2002) (collecting cases approving incentive payments).

The reasoning behind incentive payments applies with particular force in the employment context and even more strongly here, where a sensitive profession is at issue. See Briggs v. PNC Fin. Services Group, Inc., 2016 WL 7018566, at *2 (N.D. Ill. Nov. 29, 2016 (quoting Velez v. Majik Cleaning Serv., Inc., No. 03 Civ. 8698, 2007 WL 7232783, at *7 (S.D.N.Y. June 25, 2007)) ("[I]n employment litigation, the Claimant is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a

14

whole, undertaken the risk of adverse actions by the employer or co-workers.").[7] Here, Ms. Campbell and the other Plaintiff Representatives lent their names and reputations to a lawsuit on behalf of exotic dancers, risking reputational damage for the sake of their fellow dancers.

It is common for courts to approve incentive payments in the range of those requested in this case. See e.g., Briggs, 2016 WL 7018566, at *2 (approving service awards of $12,500.00 to each of named Claimants in FLSA case); Castillo v. Noodles & Co., 16-CV-03036, 2016 WL 7451626, at *2 (N.D. Ill. Dec. 23, 2016) (approving service awards of $10,000.00 to each of named Claimants in FLSA case). Thus, because the incentive payment proposed here are reasonable, the Court should award the requested awards.

## IV.    CONCLUSION

Based upon the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Final Approval of the Settlement Agreement.


Dated: July 14, 2025                                Respectfully submitted,

                                                    BRANDI CAMPBELL, et al.

                                                    /s/ Bradley Manewith
                                                    Bradley Manewith, IARDC No. 06280535
                                                    Lichten & Liss-Riordan, P.C.
                                                    5 Revere Drive, Suite 200
                                                    Northbrook, IL 60062
                                                    Tel: (617) 994-5800
                                                    bmanewith@llrlaw.com

---

[7]    See also Frank v. Eastman Kodak Co., 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (noting that service awards are especially appropriate in employment litigation where "the Claimant is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers.")

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2025, a true and accurate copy of the foregoing, Plaintiffs' Motion for Preliminary Approval of the Collective Settlement Agreement, was filed via this Court's CM/ECF system and served upon all parties of record.


<u>*/s/ Bradley Manewith*</u>
Attorney for Plaintiffs